**\*NOT FOR PUBLICATION\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PIERRE H. SIMON, <br><br> Plaintiff, <br><br> v. <br><br> SHORE CAB, LLC, AFZAL MOHAMED, MUSTAQ MOHAMED, and MOHAMMED KHAN, <br><br> Defendants. | Civil Action No. 13-6290 (FLW)(LHG) <br><br> **OPINION** |

**WOLFSON, United States District Judge**:

This matter comes before the Court on a motion, pursuant to Federal Rule of Civil Procedure 56, filed by Defendants Shore Cab, LLC ("Shore Cab"), Afzal Mohamed, Mustaq Mohamed, and Mohammed Khan (collectively, "Defendants"),[1] for summary judgment on the Complaint filed by Plaintiff Pierre H. Simon ("Simon" or "Plaintiff"). Simon was a taxi cab driver for Shore Cab and claims that during his employment, he was subjected to a hostile work environment, racial and religious discrimination, and retaliation based on complaints he made, and that he was ultimately terminated based because of racial and religious discrimination.

For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part. Specifically, Defendants' motion for summary judgment on Counts V, VI, VIII, IX, XI, XIV and XIX is granted. Defendants' motion for summary judgment on Counts I, II, and XII is granted with respect to Plaintiff's complaint of racial discrimination based upon

---

[1] The Court notes that the individual Defendants also appear in various documents as "Mohamed Afzel" and "Mustaq Mohamed." The Court will refer to these individuals by how they are identified on the Court's ECF docket.

1

allegedly receiving a reduced number of fares, but it is denied with respect to Plaintiff's complaint of religious discrimination when he was allegedly terminated by Shore Cab.

I.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are undisputed unless otherwise noted.  In April 2008, Defendants hired Simon to work as a taxi driver for Shore Cab.  Defendants' Statement of Material Facts [hereinafter "SOMF"] ¶ 1.  Simon identifies as "black" and a "Christian."  *Id.* at ¶¶ 26, 45.  Prior to hiring Simon, Defendants[2] knew Simon and had observed Simon wearing hats with religious expressions on several occasions.  *Id.* at ¶¶ 46, 47, 51.

During his employment by Shore Cab, Simon wore "religious hats" and expressed his religious beliefs by making statements about whether certain acts were "godly" or "ungodly."  *Id.* at ¶¶ 49, 50.  The parties disagree over whether Defendants ever indicated they disapproved of Plaintiff's religious expression.  *Id.* at ¶ 53.  Plaintiff contends that when he wore hats with religious messages, the individual defendants would not "talk normally face-to-face [with him] or standing face-to-face" next to him.[3]  Simon Dep. T33:6-19; T66:13-22.

In or around November 2009, Simon overheard another Shore Cab driver utter a racial epithet over the Shore Cab radio.[4]  SOMF ¶¶ 29, 32, 39.  During a shift, the Shore Cab dispatcher on duty requested a driver to do a pick-up at a restaurant called Muscle Maker Grill.  Simon Dep.

---

[2] The individual defendants are all Muslims.  Deposition of Mohammed Afzel(dated May 21, 2015) [hereinafter "Afzel Mohamed Dep."] T9:19-24; Deposition of Mohamed Khan (dated May, 21 2015) [hereinafter "Mohammed Khan Dep."] T8:12-13.Deposition of Mustaq Mohamed (dated May 21, 2015) [hereinafter "Mustaq Mohamed Dep."] T10:12-13;

[3] Plaintiff has also speculated that his later "mistreatment" in Shore Cab's lineup of taxi fares "might be [based on] the religious belief."  Deposition of Pierre H. Simon (dated April 22, 2015) [hereinafter "Simon Dep."] T23-17 to 24:12.

[4] The individual defendants testified that they did not hear the racial epithet over the radio.  Afzel Mohamed Dep. T24:7-9 to 25:1-4; Mohammed Khan Dep. T18:23 to 20:21; Mustaq Mohamed Dep. T27:13-15.

T29:1-6.  When the driver responded to the call on the radio, the driver allegedly stated: "Oh, Muscle Nigger." *Id.*  Simon testified that he believes he was the intended recipient of this radio transmission, albeit "indirectly," and that he believes the individual defendants "directed" the driver to say the racial epithet over the radio because they were friends.  *Id.* at T29:10-24; *see also* SOMF ¶ 33.  At his deposition, Simon was unable to articulate a specific basis for his belief, beyond that the driver had a "close relationship" with the individual defendants and that the driver was physically close to Simon when he made the radio transmission:

> Q: Do you believe that Afzal Mohamed, Mohammed Khan or Mustaq Mohamed directed [the driver] to use that word?
>
> A: Yes, I believe so.
>
> Q: Why do you believe that?
>
> A: That's the only, only explanation that I have.  They were so close that because I don't, I don't, I never had any problem with them.
>
> Q: Why do you believe that they would have directed him to use the N word?
>
> A: I don't know.
>
> Q: You don't know?
>
> A: No.
>
> Q: So, other than your subjective belief that you just think they directed him to use the N word, you don't have any other facts that would lead you to believe they directed him to use that word?
>
> A: No, because nobody would tell me, but I base it on close relationship that he has with them and when he said that he wasn't far away from me.

Simon Dep. T28:1-20.

On or about November 10, 2009, Simon "talked to the boss" (who Simon identified as both Mohammed Khan and Mustaq Mohamed), about the use of the racial slur on the radio and, following that complaint, "from there [Simon] start[ed] having [a] problem."  *Id.* at T24:22-25:3; T25:25-26:6; T26:24-27:4; T27:9-14.  Simon contends that Defendants "didn't do anything"

3

regarding his complaint. *Id.* at 30:3-31:19. Defendants deny that Simon ever complained to them about the racial epithet he heard on the radio. *See* Mohammed Khan Dep. T19:10-24; T20:25 to 21:2; Mustaq Mohamed Dep. T12:2-11.

Following his oral complaint, Simon asserts that Defendants retaliated against him by instructing dispatchers to reduce the number of fares that he received in Shore Cab's line up. Simon Dep. T55:7-19. Simon gave the following example of his "mistreatment" in Shore Cab's line up:

> [T]here's a lineup and the lineup [is] first come, first, as long as the call is in town or around the town. . . . If the call is in, let's say, Eatontown and they decide to call a driver that is in Eatontown, it happened to [be] me, if I'm in Eatontown drop off, there's a call, the dispatcher manage to give it to someone because they . . . [t]hey have the mechanism to do that. When the dispatcher was in Eatontown, I say 28, just check me in Eatontown, I'm clear in Eatontown, my belief [is] they don't, they make believe they don't hear me. And they might call in a taxi driver that is in Eatontown after me to give that call to.

*Id.* at T41:16 to 42:2. From November 10, 2009 to December 17, 2011, Simon wrote approximately 19 letters to Defendants to complain about the mistreatment he perceived that he was receiving in the Shore Cab line-up, although none of these letters mentioned discrimination based on race or religion.[5]  SOMF ¶ 56; Simon Dep. T72:24 to 75:12.

Simon stopped working for Shore Cab in May 2012; the parties dispute both the facts that lead up to his end of employment and whether Simon was terminated.

According to Simon, the incident began with a fight, over the radio, between himself and a dispatcher because the dispatcher skipped him in the lineup and assigned a fare to another driver. Simon Dep. T58:12 to 61:3. Simon denied that he called the dispatcher a "bitch," *id.* at T58:3-5, but testified that he told her: "I said to her I know you don't do it on your own. The boss is making

---

[5] The Court must rely only on Plaintiff's testimony concerning the content of these letters because neither party has provided them as exhibits to their moving papers on this motion.

4

you doing it. They call him daddy. I said daddy making you do it. They call him sugar daddy. They call him sugar daddy." *Id.* at T59:21-25. The dispatcher responded that Simon would be taken "off the air." *Id.* at T60:1-16. Simon became frustrated because the other drivers were "clicking" their radios' microphones, so he went to the Long Branch train station and talked with another cab driver, whose name Simon could not recall. *Id.* at T44:21 to 45:8; T59:16-21; T60:16-18.

According to Simon, while he was at the train station, Defendant Afzal Mohamed approached Simon's car on foot, leaned into Simon's cab, and "started shooting words" at Simon, asking him what he was doing there and whether he was clicking his radio. *Id.* at T45:14 to 46:3; T60:16-21. Simon claims Afzal Mohamed opened his cab door and started to break Simon's electronic equipment and told Simon "why don't you eat your F hat."[6] *Id.* at T46:4-25; T60:16-21; T75:24 to 76:1. Simon called the police, who separated them and unsuccessfully attempted to dissuade Simon from pressing charges against Afzal Mohamed, informing Simon that Afzel Mohamed "asked me [the police officer] to tell you [Simon] if you don't press charge[s] against him [Afzel Mohamed], he will let you drive . . . ." *Id.* at T46:20 to 47:25. Simon stayed home for two days after his altercation with Afzal Mohamed and, when he tried to return to work at Shore Cab, a dispatcher informed him, "you don't have a job here anymore[.]" *Id.* at T50:18-22.

According to Afzal Mohamed, Simon's separation from Shore Cab began when Simon was fighting with a dispatcher and insulting the dispatcher's parents. Afzal Mohamed Dep. T25:8-21. Afzal Mohamed told Simon to stop, and when Simon did not, Afzal Mohamed told Simon that he would be "check[ed] out" for the day. *Id.* at T25:18-21. After being checked out, Simon allegedly

---

[6] Although Simon did not flesh out the explicative at this point in his deposition testimony, elsewhere he makes clear that he is alleging Afzel Mohamed told Simon to eat his "fucking" hat. *See* Compl. ¶ 30; Simon Dep. at 75:13-18.

5

went to the Long Branch train station, which was "about a block" away from Shore Cab's offices, and keyed his radio microphone to disrupt Shore Cab's dispatching of other cabs. *Id.* at T25:22 to 26:4. Afzal Mohamed claims that he went to Simon's cab and asked him to stop keying the microphone, and "reached" for the microphone to take it away from Simon. *Id.* at T26:4-14. Afzal Mohamed denied that he told Simon to "eat his fucking hat." *Id.* at T27:6-8. Afzal Mohamed claims Simon called the police, and they went to court, and that a week later Simon had "check[ed] in" and Afzal Mohamed told the dispatcher on duty to tell Simon to "come to the base" because Afzal Mohamed wanted to talk to him, but Afzal Mohamed "never hear[d] from him again." *Id.* at T26:15-20.

The parties agree that after the incident, Simon filed charges against Afzal Mohamed in municipal court and that those charges were settled. SOMF ¶¶ 22-23.

Sometime thereafter, Plaintiff filed a complaint with the EEOC. SOMF ¶ 19. The EEOC investigated Plaintiff's claim, determined that it was unable to conclude that any statute was violated, and issued a right to sue letter on July 25, 2013. *Id.* at ¶¶ 19, 20. Plaintiff filed this action on November 22, 2013,[7] alleging that his former employer, Shore Cab, as well as his former supervisors and the co-owners of Shore Cab, Afzal Mohamed, Mustaq Mohamed, and Mohammed Khan, in their individual and official capacities, engaged in discrimination against Plaintiff on the basis of his race and religion, retaliated against Plaintiff, and created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C.

---

[7] Defendants have not asserted any argument concerning Plaintiff's failure to file suit within the 90-day time period following the issuance of the EEOC's right to sue letter, 42 U.S.C. § 2000e-5(f)(1), and, therefore, this defense has been waived. *Figueroa v. Buccaneer Hotel*, 188 F.3d 172, 176 (3d Cir. 1999).

1981 ("Section 1981"), the New Jersey Law Against Discrimination ("NJLAD"), and the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -14.

On December 27, 2013, Defendants filed a motion to dismiss several of the Counts of Plaintiff's Complaint. On June 19, 2014, this Court issued an Order dismissing Counts III, IV, VII, X, XIII, XV, XVI, XVII, XVIII, XX, XXI and XXII of Plaintiff's Complaint. *See Simon v. Shore Cab, LLC*, No. 13-6290, 2014 U.S. Dist. LEXIS 83435 (D.N.J. June 19, 2014). On August 14, 2015, Defendants filed the instant motion seeking judgment on the remaining counts of the complaint, alleging intentional discrimination under Title VII and Section 1981 (Counts I, II, and XII), hostile work environment under Title VII and Section 1981 (Counts V, VI, and XIX), retaliation under Title VII and Section 1981 (Counts VIII, IX, and XIV), and retaliation under CEPA (Count XI).

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health System v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); *Williams v.*

7

*Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989) (the non-movant must present affirmative evidence – more than a scintilla but less than a preponderance – which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (*i.e.*, depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322; *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell*, 381 F. Appx. 211, 213 (3d Cir. 2010) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. DISCUSSION

### A. Independent Contractor Status of Plaintiff

Defendants first argue that Plaintiff was an independent contractor and, therefore, this Court should grant "their motion for summary judgment on this basis alone." Def. Br. 6-7. Plaintiff argues that he has alleged the he was an employee of Shore Cab, that Shore Cab set the prices and published a policy in Plaintiff's cab, and that Defendants have not submitted any contract establishing Plaintiff as an independent contractor, nor provided an analysis of relevant factors that are required to show whether Plaintiff was an independent contractor. Pl. Opp. Br. 10.

As a preliminary matter, even if there were no dispute regarding whether Plaintiff was an independent contractor of Shore Cab, that determination would not be dispositive of all of Plaintiff's claims. While the Court could grant judgment on Plaintiff's claims under Title VII (Counts I, VI, IX), it could not grant judgment on Plaintiff's claims under Section 1981 (Counts II, V, VII, XIV, and XIX) or CEPA (Count XI) solely on the basis of Plaintiff's status as an independent contractor. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179-81 (3d Cir. 2009) (concluding that plaintiff was an independent contractor, not an employee of defendant and, therefore, not protected by Title VII, but holding that "an independent contractor may bring a cause of action under section 1981 for discrimination occurring within the scope of the independent contractor relationship"); *D'Annunzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 114 (2007) (reaffirming the appropriateness of the test set forth in *Pukowsky v. Caruso*, 312 N.J. Super. 171 (App. Div. 1998) "for assessing the status of an alleged 'independent contractor' claiming protection as an 'employee' under CEPA.").

The common law of agency controls the analysis of whether an individual is an independent contractor and, thus, outside the protections of Title VII. *See Pavlik v. Int'l Excess Agency, Inc.*, 417 F. Appx. 163, 166 (3d Cir. 2011) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-24 (1992)). To make this determination, the Court must consider the following, non-exhaustive list of factors outlined in *Darden*:

> [1] the hiring party's right to control the manner and means by which the product is accomplished. . . . [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

*Darden*, 503 U.S. 318, 323-24 (1992); *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015). In analyzing the above factors, the Third Circuit has "generally focused" on "which entity paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities." *Faush*, 808 F.3d at 214 (quoting *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013) (internal quotation marks omitted). "However, [s]ince the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Id.* (quoting *Darden*, 503 U.S. at 324) (internal quotation marks omitted).

The parties' briefing provides little analysis of the *Darden* factors, and even fewer citations to the record concerning the factors they do address. Moreover, even if this Court were able to rule on the issue of Plaintiff's status as an independent contractor, it would also have to analyze whether Plaintiff could still be considered an "employee" for purposes of CEPA under the *Pukowsky* factors,[8] which neither party addresses. This Court has no duty to perform the parties' legal work for them.[9] Accordingly, Defendants' motion, insofar as it is based on Plaintiff's status as independent contractor, is denied without prejudice.

---

[8] Although many of the factors in the *Pukowsky* "hybrid" test overlap with the factors of the *Darden* "right to control" test, the two tests are distinct. *See, e.g.*, *Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 307-10 (2015) (discussing tests).

[9] "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082 (1990); see also *Haagensen v. Penn. State Police*, 490 F. App'x 447, 455 (3d Cir. 2012) ("[A]n argument consisting of no more than a conclusory assertion . . . (without even a citation to the record) will be deemed waived.") (internal quotation marks omitted), *cert. denied*, __ U.S. __, 134 S. Ct. 53 (2013); *United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir.) ("An appellant's brief must contain his or her argument, which must incorporate appellants' contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . . .") (internal quotation marks omitted)), *cert. denied*, 555 U.S. 1049 (2008); *Auto Owners Ins. Co. v. La Oasis, Inc.*, No. 04-174, 2005 U.S. Dist. LEXIS 43565, *45 (N.D. Ind. May 26, 2005) ("[C]ourts need not and

**B.      Intentional Discrimination under Title VII and Section 1981**

Defendants have moved for summary judgment on Plaintiff's claims of intentional discrimination (Counts I, II, and XII), arguing that there is no direct evidence that demonstrates racial or religious discrimination by Defendants and that Plaintiff suffered no adverse employment action. Def. Br. 8-10. Plaintiff argues, however, that he has satisfied his burden of showing his *prima facie* claims of intentional discrimination. Pl. Opp. Br. at 11-12.

Under both Title VII and Section 1981, in the absence of direct evidence, claims of racial and religious discrimination are examined under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-05 (1974). *See Sanborn v. Postmaster Gen. of the United States*, 431 F. Appx. 188, 190 (3d Cir. 2011); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999); *see also Schurr v. Resorts Intern. Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999) ("[T]he elements of employment discrimination under Title VII are identical to the elements of a Section 1981 claim.").

Under that framework, a plaintiff has the burden of establishing a *prima facie* case of discrimination by proving: "(1) he is a member of a protected class; (2) he suffered some form of adverse employment action; and (3) this action occurred under circumstances giving rise to an inference of unlawful discrimination that might occur when nonmembers of the protected class are treated differently." *Carter v. Midway Slots & Simulcast*, 511 F. Appx. 125, 128 (3d Cir.), *cert. denied*, __ U.S. __, 134 S. Ct. 138 (2013). If the plaintiff succeeds in establishing a *prima facie* case, then the burden of production shifts to the defendant to "articulate some legitimate,

---

indeed should not expend limited judicial resources in researching, refining, and otherwise fleshing out arguments the parties themselves do not adequately support"); *Africa v. Digulielmo*, No. 04-447, 2004 U.S. Dist. LEXIS 21220, *107 (E.D. Pa. Oct. 19, 2004) ("This court will not conduct legal research on behalf of [a party] in order to determine whether there is [authority] to support [his argument]").

nondiscriminatory reason" for the adverse employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated nondiscriminatory rationale was "merely a pretext for discrimination, and not the real motivation for the unfavorable job action." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003), *cert. denied*, 541 U.S. 1064 (2004)

Here, Plaintiff argues that he suffered two forms of adverse employment action that are the product of both religious and racial discrimination:  (1) reduced number of fares, and (2) termination.

Plaintiff has failed to satisfy his burden of proving racial and religious discrimination with respect to his claim that he received a reduced number of fares. Plaintiff offers no evidence, other than his own self-serving speculation, to show that he suffered any reduction in the amount of fares he received from Shore Cab. *See Atkinson v. N. Jersey Developmental*, 453 F. Appx. 262, 265-66 (3d Cir. 2011); *see also Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) ("[C]onclusory, self-serving affidavits [and testimony] are insufficient to withstand a motion for summary judgment . . . . In this case, Gonzalez's own, sworn statements are insufficient to survive summary judgment."). For example, Plaintiff failed to submit any evidence demonstrating either that other drivers received a greater share of the dispatched fares during the relevant period, or that the amount of Plaintiff's fares were more numerous prior to the alleged discriminatory period. Accordingly, this Court need not engage in *McDonnell Douglass*'s burden-shifting analysis.

However, Plaintiff's claim of religious discrimination resulting in his alleged termination is not based solely on circumstantial evidence and, therefore, does not implicate the *McDonnell Douglass* test. Instead, Plaintiff relies on direct evidence that Afzel Mohamed told Plaintiff to "eat

12

his F hat," which had religious expressions on it, during the altercation that Simon claims ended with his alleged termination.[10] Such claims are analyzed under the "mixed-motive" test of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Tolan v. Temple Health Sys. Transp. Team*, 557 F. Appx. 132, 138 (3d Cir. 2014).

> Under the . . . "mixed-motive" analysis, if the plaintiff shows "by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," the burden shifts to the defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." In order to trigger a mixed-motive framework, "a plaintiff need only present *sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence*, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"

*Id.* (citations omitted) (emphasis added in original).

Here, granting Plaintiff all reasonable inferences, this Court concludes that Plaintiff has presented sufficient evidence from which a jury could conclude that his religion was a motivating factor in his alleged termination.[11] Moreover, there are clearly disputes of material fact that would prevent this Court from granting summary judgment to either party. The parties not only dispute whether Plaintiff was, in fact, terminated, but also whether Afzel Mohamed was motivated by religious animus while he, from Plaintiff's view point, was destroying Plaintiff's cab and terminating him from employment. According to Plaintiff, Afzel Mohamed insulted Simon for

---

[10] Plaintiff's account of his alleged termination does not demonstrate that it occurred "under circumstances giving rise to an inference of unlawful discrimination that might occur when nonmembers of the protected class are treated differently," *Carter*, 511 F. Appx. at 128, and, accordingly, to the extent Plaintiff's complaint can be read to assert that his alleged termination occurred as a result of racial discrimination, Plaintiff has failed to show a prima facie case.

[11] Direct evidence of discrimination is defined as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's race [or religion] in reaching their decision to [dismiss] him." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002). This evidence must be "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994).

13

his religious expression while destroying his taxi cab, and attempted to dissuade Plaintiff from pressing charges against him in exchange for allowing him to continue to work for Shore Cab. According to Defendants, Plaintiff was fighting with dispatchers and disrupting Shore Cab's operations when he was asked to go home, and when he returned and was summoned to Shore Cab's base of operations to speak about the incident, he chose to cease working for Shore Cab.

Even assuming, *arguendo*, that Defendants would argue that the outcome of the altercation with Plaintiff would have been the same even absent any illegitimate factor, those are disputed material issues of fact that are left for the trier of fact to determine. Scant though the evidence supporting Plaintiff's claim of intentional discrimination may be – resting on the disputed, single utterance by Afzel Mohamed during a host of other disputed circumstances – this Court cannot weigh the parties' credibility and determine whether Simon or Mohamed Afzel's version of events is true, or whether Mohamed Afzel's actions in May 2012 that allegedly resulted in the end of Plaintiff's employment were motivated by an invidious discriminatory animus.

Accordingly, Defendants' motion for summary judgment with respect to Counts I, II, and XII of the Complaint will be granted in part and denied in part. Specifically, Defendants' motion is granted with respect to Plaintiff's complaint of racial discrimination in the form of reduced number of fares, but it is denied with respect to Plaintiff's complaint of religious discrimination when he was allegedly terminated by Shore Cab.

**C.     Hostile Work Environment under Title VII and Section 1981**

Defendants also move for summary judgment on Plaintiff's claims of hostile work environment (Counts V, VI, and XIX), arguing that (1) Plaintiff has only provided evidence of a single incident of a racial epithet being used by a driver at Shore cab on a radio transmission, which

14

was not directed at Plaintiff, and (2) that Defendants can only be held liable for the driver's racial epithet if they were negligent in controlling work conditions. Def. Br. 10-13.

However, Plaintiff's opposition brief contains no legal or factual argument opposing summary judgment on these counts and, accordingly, this Court deems these claims abandoned. *See Damiano v. Sony Music Entertainment*, 975 F. Supp. 623, 627 (D.N.J. 1996); *see also Franco v. Conn. Gen. Life Ins. Co.*, No. 07-6039, 2014 U.S. Dist. LEXIS 85595, *10 n.3 (D.N.J. June 24, 2014); *Rhino Assocs., L.P. v. Berg Mfg. & Sales Corp.*, 482 F. Supp. 2d 537, 549 n.14 (M.D. Pa. 2007); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003). Moreover, it appears that the record fails to show the "severe and pervasive" discrimination necessary to support a hostile work environment claim. Insidious as it may be, Plaintiff heard the word "nigger" only once in his place of employment, which he acknowledges was not specifically directed at him, and although he contends his complaint concerning the incident was not properly investigated, he fails to point to another instance of a similar complaint that was not investigated by Defendants. *See Huggins v. Coatesville Area Sch. Dist.*, 452 F. Appx. 122, 127 (3d Cir. 2011) (holding that to support a hostile work environment claim, the harassment must be so "severe and pervasive" that it "alter[s] the conditions of his employment" and creates "an abusive working environment" and noting that "[o]ffhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (citations omitted); *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) ("[C]omments referring to other individuals that were merely overheard by [plaintiff] are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court in [*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)], cautioned should not be considered severe or pervasive enough to constitute a hostile work environment.").

Accordingly, the Court grants Defendants' motion for summary judgment on Counts V, VI, and XIX of the Complaint.

### D.     Retaliation under Title VII and Section 1981

With respect to Plaintiff's claims of retaliation (Counts VIII, IX, and XIV), Defendants argue that Plaintiff never complained to them concerning the radio incident and that Plaintiff was not terminated, but rather chose not to return to work voluntarily.  Def. Br. 13-14.  Plaintiff argues that he did complain to Defendants and, but for that complaint, he would not have received a reduced number of fares or, ultimately, been terminated.  Pl. Opp. Br. at 12-13.

Like discrimination claims, in the absence of direct evidence, retaliation claims under Title VII and Section 1981 are also examined under the *McDonnell Douglass* burden-shifting test.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278-79 (3d Cir. 2000); *Doe v. Sizewise Rentals, LLC*, No. 09-3409, 2012 U.S. Dist. LEXIS 50089, *14-15 (D.N.J. Apr. 10, 2012), *aff'd*, 530 F. Appx. 171 (3d Cir. 2013).  "[T]o establish a prima facie retaliation claim under Title VII [and] § 1981, . . . [a plaintiff] must show:  (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action."  *Hutchins v. United Parcel Services, Inc.*, 197 F. Appx. 152, 156 (3d Cir. 2006) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).  The employer can rebut the employee's *prima facie* case by asserting a legitimate, nondiscriminatory reason for the employment action.  *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300-01 (3d Cir. 2007); *Doe*, 2012 U.S. Dist. LEXIS 50089 at *15.  The burden then shifts back to the plaintiff to show by a preponderance of the evidence that the reasons offered by the employer are merely a pretext for discrimination.  *See Marra*, 497 F.3d at 342; *Doe*, 2012 U.S. Dist. LEXIS 50089 at *15.

There is clearly a dispute of fact concerning the first element of Plaintiff's *prima facie* case, as the parties do not agree whether Plaintiff ever complained of the radio incident to Defendants.[12] Similarly, with respect to the second element, the factual dispute concerning whether Plaintiff was terminated would also prevent the Court from granting summary judgment on this basis.[13] Nevertheless, even finding that these disputes of fact exist with respect to the first and second elements of Plaintiff's *prima facie* claim of retaliation (with respect to his alleged termination), Plaintiff has failed to provide any evidence to show a causal connection between his complaint about the radio incident in November 2009, and his alleged termination in May 2012, other than his bald assertion that his oral complaint is the "but for" cause of his reduced number of fares and alleged termination.  Pl. Br. at 13.

Moreover, even if this Court were to consider Plaintiff's letters of complaint concerning his mistreatment in the lineup as an extenuation of his original, oral complaint in 2009,[14] the temporal proximity of Plaintiff's last letter, on December 17, 2011, and Plaintiff's alleged termination in May 2012, is not so "unusually suggestive" so as to establish the necessary causal

---

[12] The Court notes that although there appears to be a dispute of fact whether there was any religious animus motivating Plaintiff's alleged termination in the record – insofar as the parties dispute whether Defendant Afzel Mohamed told Plaintiff to "eat his F hat" in the altercation prior to Plaintiff's alleged termination – Plaintiff claims that he has been retaliated against based on his November 2009 complaint concerning the radio incident, not his religious expression.  Compl. ¶¶ 85, 95, 138.

[13] As discussed above, Plaintiff has failed to provide any evidence that he suffered a reduction in the number of fares he received.  Accordingly, to the extent Plaintiff's retaliation claim is premised on his subjective belief that he received less fares after his complaint in 2009, summary judgment would be appropriate based on Plaintiff's failure to satisfy the second element of his *prima facie* case:  an adverse employment action.

[14] As noted above, Plaintiff has conceded that his letters of complaint do not concern racial or religious discrimination.  SOMF ¶ 56; Simon Dep. T72:24 to 75:12.  Therefore, at best, they merely show that Plaintiff had a subjective belief that he was receiving a reduced number of fares. They are not evidence that Plaintiff was, in fact, receiving a reduced number of fares.

connection between his end of employment and his complaint concerning the radio incident. *See Andreoli*, 482 F.3d at 650 (finding five-month time period between complaint and adverse action insufficient to raise an inference of causation). Plaintiff has not proffered any other causal connection.

Accordingly, the Court grants Defendants' motion for summary judgment on Counts VIII, IX, and XIV of the Complaint.

### E.     Conscientious Employee Protection Act (CEPA)

Finally, on Plaintiff's claim for violation of CEPA (Count XI), Defendants argue that Plaintiff has failed to submit evidence that Defendants' engaged in activity that violated a law or regulation, that Plaintiff engaged in whistle-blower activity, that there was any adverse employment action taken against him, and that Plaintiff has failed to established a causal connection between his complaint and any adverse employment action. Def. Br. 14-17. Plaintiff argues that he has provided adequate evidence to support his *prima facie* case under CEPA. Pl. Opp. Br. at 13-15.

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging" in such activity. *Abbamont v. Piscataway Twp. Bd. of Ed.*, 138 N.J. 405, 431 (1994); *see also Higgins v. Pascack Valley Hospital*, 158 N.J. 404, 417 (1999). To succeed on a CEPA claim, a plaintiff must prove four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. *See Dzwonar v. McDevitt*, 177 N.J. 451, 4632 (2003); *Kolb v. Burns*, 320 N.J. Super. 467, 476 (App. Div. 1999). Once a plaintiff has

established a *prima facie* case under CEPA, courts employ the burden-shifting analysis, outlined above, that is used in federal discrimination cases involving "pretext" claims. *Blackburn v. United Parcel Services, Inc.*, 179 F.3d 81, 92 (3d Cir.1999).

Although CEPA has a waiver provision that prevents Plaintiffs from bringing duplicative retaliation claims in addition to CEPA claims, N.J.S.A. 34:19-8, that provision does not apply to Plaintiff's retaliation claims arising under federal law. *Skoorka v. Kean Univ.*, No. 09-3428, 2015 U.S. Dist. LEXIS 71697, *40-41 (D.N.J. June 2, 2015); *Anderson v. Mercer Cnty. Sheriff's Dep't*, No. 11-7620, 2012 U.S. Dist. LEXIS 83397, *14-15 (D.N.J. June 15, 2012). Nevertheless, Plaintiff's CEPA claim for retaliation fails, substantively, for the same reasons his federal retaliation claims fail, as set forth above – namely, Plaintiff's failure to establish the requisite causal connection.

Accordingly, the Court grants Defendants' motion for summary judgment on Count XI of the Complaint.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Specifically, Defendants' motion for summary judgment on Counts V, VI, VIII, IX, XI, XIV and XIX is granted. Defendants' motion for summary judgment on Counts I, II, and XII is granted with respect to Plaintiff's complaint of racial discrimination in the form of reduced number of fares, but it is denied with respect to Plaintiff's complaint of religious discrimination when he was allegedly terminated by Shore Cab.

Dated: March 16, 2016

/s/ The Honorable Freda L. Wolfson

United States District Judge